IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| SARAH LEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-0722-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sarah Lee seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) relying on vocational expert testimony which conflicts with the Dictionary of Occupational Titles, (2) failing to consider the third-party statement of Mr. Merriman, (3) failing to consider the impact of plaintiff's obesity on her residual functional capacity, and (4) failing to include all of Mr. Keough's opinions in the residual functional capacity assessment. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On February 28, 2006, plaintiff applied for disability benefits alleging that she had been disabled since July 11, 1999. She later amended her alleged onset date to February 28, 2006, to correspond with the filing date of her application for supplemental security income (Tr. at 10). Plaintiff's application was denied initially and by Administrative Law Judge Robert Evans on November 12, 2008. On July 30, 2010, the Appeals Council remanded the case and directed the ALJ to obtain additional evidence concerning plaintiff's post traumatic stress disorder, depression and social phobia; evaluate plaintiff's mental impairment; give further

consideration to plaintiff's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to the evidence of record in support of assessed limitations; and if warranted, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the plaintiff's occupational base (Tr. at 60-61). On April 13, 2011, a second hearing was held before Administrative Law Judge George Bock. On June 15, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On June 11, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson

v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Richard Sherman in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record/Work History Report**

The record shows that plaintiff's lifetime earnings total $751.88 (Tr. at 140, 148-149). She earned $325.00 in 1996, $25.18 in 1997, and $401.70 in 1998. Plaintiff's earnings were reported from the Full Employment Council, Hardee's, Sonic, Small World, and Richmond Public School District (Tr. at 154). She described her past work as a cook at two restaurants, a retail position at the Salvation Army, and a care giver at a day care (Tr. at 160). Plaintiff has not worked since 1998. On March 24, 2006, she reported, "I cannot find a job because when they hear about my back they never give me a job and my child support is so [sporadic] I can hardly pay my bills." (Tr. at 167).

**Function Report**

In a Function Report dated March 24, 2006, plaintiff stated that she fills the dishwasher, sweeps the floors, mops once a week, makes dinner, takes care of three children,

prepares meals daily for about an hour each time, cleans, does laundry, and sews clothes (Tr. at 168-175). Sometimes she gets friends to help her with some of her tasks. Plaintiff does not go outside often "because I have minor agoraphobia" (Tr. at 171). Plaintiff drives "but my car is broke down right now, can't afford to fix [it]" (Tr. at 171). Plaintiff shops for groceries in stores for 30 minutes once a week. Plaintiff visits family and friends once a week.

**Disability Report**

In an undated Disability Report plaintiff reported that she weighed 140 pounds (Tr. at 176-183). Plaintiff reported that she stopped working on June 1, 1997, because her husband did not want her to work (Tr. at 177). Her employment consisted of working in two fast food restaurants, working as a crossing guard at an elementary school, working a retail job at the Salvation Army, and working as a care giver in a day care (Tr. at 178).

**Written Questions to Claimant**

In this document, dated July 26, 2008, plaintiff reported that she weighed 170 pounds (Tr. at 200). She stopped working in 1998 because her ex husband made her quit. Since she stopped working, she has supported herself with AFDC, child support, and food stamps. When asked what she has done to find work since her last job ended, she wrote that no one will hire her with her injury and she is afraid of people. It takes plaintiff days to clean her house due to constant pain and sometimes her friends come to help. She is able to drive but after about 30 minutes the pain is almost unbearable. Nothing in her physical or mental condition had changed since she first filed her claim two years and five months earlier. Plaintiff had Medicaid coverage (Tr. at 202), yet she has not participated in or sought treatment through physical therapy, pain management clinic, acupuncture, biofeedback, chiropractor, TENS unit, or traction because she has no money and no car (Tr. at 203). Plaintiff was asked how her

mental condition limits her ability to work. She reported that she is afraid of people she doesn't know and of large areas and has "some memory loss" (Tr. at 207).

## Function Report

On August 9, 2010, plaintiff completed a Function Report in which she reported that she prepares her own meals daily while sitting, she cleans once a week, and she shops in stores for groceries once or twice a week for less than an hour. Her condition does not affect her ability to reach, complete tasks, concentrate, understand, follow instructions, get along with others, or use her hands. She can pay attention for a long time, she follows written instructions very well, she follows spoken instructions well, she gets along with authority figures well, she handles changes in routine well, she gets very nervous when she is around groups of people she doesn't know (Tr. at 219-226, 239-246).

## Missouri Supplemental Questionnaire

In this August 9, 2010, document plaintiff reported that she has a laptop so that she can use a computer lying down. She is not currently able to drive because she has an expired license (Tr. at 227-229, 247-249).

## Function Report - Third Party

On September 5, 2010, plaintiff's fiancé, Randy Merriman, Jr., completed a Function Report - Third Party (Tr. at 263-270). He reported that plaintiff cooks dinner while sitting in a chair. It takes her two hours to cook meals and she does this daily. Plaintiff is able to go out alone, she can drive but does so rarely due to pain -- "only drives if has no other choice". She shops in stores and on the computer. She shops once a week for about an hour. Plaintiff reads and watches television all the time but has to lie down while doing these things. People come to see plaintiff or she talks on the phone. She goes to the grocery store on a regular basis and does not need anyone to go with her. She has no problems getting along with family, friends,

6

neighbors or others. Her condition does not affect her ability to understand, follow instructions, complete tasks, remember, concentrate, get along with others, or use her hands. She finishes what she starts, she can pay attention for "a while," she follows written and spoken instructions well, she gets along well with authority figures, she handles changes in routine "ok," she handles stress "fair." He concluded with the following:

> She has been unable to work since her injury and no one will hire her because of her injury an[d] feels like a burden because she can't provide for her children. She needs this to help care for her children, she doesn't get child support.

B.      **SUMMARY OF MEDICAL RECORDS**

In July 1999 plaintiff, age 21, was the unrestrained driver of a car that was struck by a train (Tr. at 470). She climbed out of the vehicle and was taken to Liberty Hospital and eventually transferred to Truman Medical Center for care of her spinal injury. Plaintiff had surgery to fuse T12 through L2 (Tr. at 422).

On October 18, 1999, plaintiff saw Dinesh Patel, M.D., for a follow up on her back (Tr. at 442-443). Plaintiff was told to start weaning herself from her back brace. She was using OxyContin (narcotic) for pain. She was told not to use Ibuprofen (non-steroidal anti-inflammatory) at that time because it may decrease bone healing. "The patient was also instructed that smoking cessation would be helpful to her in improving the healing of the bone and posterior fusion and also her left clavicular fracture."

Four years later, on December 5, 2003, x-rays of plaintiff's lumbar spine revealed a fracture of the fusion screw in the body of T12 (Tr. at 419-420). "No abnormal motion at T12 L1 is demonstrated." Plaintiff had satisfactory motion of L3 through S1 on flexion/ extension and no motion at the fusion site of T12, L1 and L2.

Two days later, on December 7, 2003, plaintiff saw Jason Datta, M.D., an orthopaedic surgeon (Tr. at 422-423). Plaintiff had begun experiencing pain about two years earlier. "It is

about the same and has progressed slightly. She has a few days that are worse than others. She does not currently take anything for the pain full time. She occasionally takes ibuprofen or Naprosyn when it is really bad, and that barely takes some edge off of it." Dr. Datta noted that the pedicle screws in T12 had fractured. "The patient had some endplate changes at T12-L1 mild degenerative changes probably due to slight motion through this segment, which is probably giving her pain." Plaintiff's physical exam was normal except that she could bend forward only about 45° due to pain, and she had mild paraspinous muscle tenderness. "I have discussed with the patient that there is no instability in her spine at this time, that her pain is not significant enough to address with any type of surgery. . . . I do not believe that she is a candidate for any type of surgical intervention for this, and she has no instabilities noted and no signs of stenosis present. I have discussed with her that this problem is probably going to be lifelong and we need to work on having her good days outweigh her bad days, but eventually, she may develop significant arthritis at this level in the far future." Dr. Datta recommended physical therapy and prescribed Relafen, a non-steroidal anti-inflammatory, as needed for pain.

On September 23, 2004, plaintiff saw Ram Chandra, D.O., complaining of severe low back pain (Tr. at 404, 588). Dr. Chandra ordered plaintiff's surgical records and prescribed Amitriptyline (antidepressant) for her pain.

On October 25, 2004, plaintiff saw Dr. Chandra for a follow up on pain (Tr. at 332, 404, 588). Plaintiff told Dr. Chandra that the "Amitriptyline does help her pain".

On December 29, 2004, plaintiff saw Michael Johnston, RN, for treatment of a urinary tract infection (Tr. at 584).

On February 1, 2005, plaintiff saw Dr. Chandra for medication refills (Tr. at 330, 402, 584). He continued her on Amitriptyline and recommended Trazodone (antidepressant) for

8

thoracic and lumbar pain.  He also assessed nicotine addiction.  "She wants medication for this, I don't think Wellbutrin would be a good choice since she is already on multiple other antidepressants but possibly she may be a good candidate for Nicotrol inhaler.  She is going to check into whether she wants to pay for this or not."

On February 6, 2005, plaintiff had x-rays of her thoracic spine which showed that both pedicle screws of the T12 were fractured and the disk between T12 and L1 was narrow (Tr. at 400-401, 582-583).

On April 5, 2005, plaintiff saw Dr. Chandra and complained of insomnia (Tr. at 399, 581).  She did not mention any back pain on this visit.  Dr. Chandra prescribed Ambien.

On November 14, 2005, plaintiff had a psychological consultation with Gary Horner, Ph.D. (Tr. at 322-324).  Plaintiff reported weighing 130 pounds.  She was noted to be well groomed, her general activity level was relaxed, she was cooperative and appeared to talk easily.  Her speech was logical and goal directed.  Mood and affect were normal to mildly anxious.  Attention and concentration were good.  Memory for recent and distant events was good.  Intellectual functioning was in the broad average range.  Judgment and insight were fair.  "Social skills in this interview are good.  Eye contact is good."  No specific nervous habits were noted.  Plaintiff denied suicidal thoughts.

"I slowly freak out around people . . . people make me uneasy".  She took amitriptyline for around 9 months for pain.  She said as long as she took it every day it worked "it took the edge off".  She also took trazodone for 5 months for insomnia and it "worked pretty good".

* * * * *

Regarding her wreck, she was driving alone and went onto an uncontrolled track crossing where the car and train collided.  Alcohol was not involved in the accident.  She was "pretty much unconscious" for the first three days and remained in the hospital for a total of seven days. . . .  Currently symptoms from the PTSD include being terrified of trains, train tracks, any sound of trains and most any T shaped intersection that could involve a side collision.  She is fearful of going fast in a car.  She used to be outgoing, but now she would rather stay at home where she feels safest.  She hates to go

9

to shopping malls where there are a lot of people. Even smaller stores "I try to get in and out fast". She now mostly socializes with people she knows.

When around other people "I'm constantly watching to see what they're doing, how they stand". This is getting worse over time. "I feel like I have to . . . my boyfriend says I'm getting paranoid . . . constantly looking out to see what's going on".

Plaintiff said her mother thought she was just being nosy, but plaintiff tended to agree with her boyfriend that she was paranoid and not nosy. Plaintiff said most of the time she is fine leaving the house. "Her energy level is okay. . . . Her attention and concentration is good. She has increased irritability due to pain. She has a hobby of reading. She walks and uses weights for regular exercise."

Ms. Lee last worked in 1998. Her ex-husband wanted her to be a stay at home mom and take care of the children. In the current household of six people, she does 80% of the food preparation and 50% of the clean up after meals. She does 50% of housecleaning and laundry. She and her boyfriend share shopping and handling finances.

Dr. Horner found that plaintiff was able to understand and remember detailed and simple instructions. She was able to sustain concentration and persistence in most things (i.e., she could not work for a railroad). She was able to relate socially and she could adapt to changes in her social environment. He assessed post traumatic stress disorder, chronic; social phobia, mild; and dyssomnia not otherwise specified.

On December 6, 2005, plaintiff saw Dr. Chandra for a follow up (Tr. at 329, 399, 581). "She had her Medicaid disability evaluation and her T12 pedicle screws are fractured even worse now. She is going to have to have reconstruction. She is having a lot of thoracic pain." Dr. Chandra assessed T12 pedicle screw fractures and depression/chronic pain. He prescribed Amitriptyline, an antidepressant.

On February 16, 2006, plaintiff saw Dr. Chandra and reported that the Amitriptyline was not helping her back pain[1] (Tr. at 328, 398, 580). Dr. Chandra assessed chronic back pain and prescribed Neurontin.[2]

On February 28, 2006, plaintiff completed her application for disability benefits. This is also her amended alleged onset date.

On March 16, 2006, plaintiff saw Dr. Chandra and reported that the Neurontin was not helping her (Tr. at 328, 398, 580). Dr. Chandra assessed chronic pain secondary to thoracic hardware abnormalities and dislodging. He discontinued Neurontin and prescribed Lyrica.[3]

On March 23, 2006, plaintiff saw Dr. Chandra and reported that Lyrica was not helping her pain (Tr. at 327, 397, 579). Dr. Chandra assessed chronic thoracic pain secondary to a loose screw. He recommended a Toradol[4] shot and he prescribed Toradol three times a day as needed.

On May 25, 2006, plaintiff saw Dr. Chandra for symptoms of a urinary tract infection (Tr. at 397, 579). Dr. Chandra refilled plaintiff's Toradol and Ultram[5] for her back pain.

On June 5, 2006, plaintiff saw Dr. Chandra for a well woman exam (Tr. at 382, 575). He recommended that she be evaluated by a specialist in regard to her fractured pedicle screws.

---

[1]The December 6, 2005, medical record indicates that Dr. Chandra prescribed Amitriptyline for "depression/chronic pain" (Tr. at 329).

[2]Treats nerve pain.

[3]Treats nerve and muscle pain.

[4]Non-steroidal anti-inflammatory.

[5]Also called Tramadol, a narcotic-like pain reliever.

On June 13, 2006, plaintiff, age 28, was seen by Syed Hasan, M.D. (Tr. at 337-340).

. . . She continues to have back pain despite taking pain medications.

Furthermore, she complains of having pain in the left collar bone where she had fracture of the left clavicle. She complains of having headache off and on. Lately, she has developed tingling and numbness of fingers and toes as well. She believes this is secondary to the trauma to the spinal cord. She was divorced four years ago and has increasing social phobia since that time. Since then, following the accident she has developed post traumatic stress disorder. She still panics if she sees a freight train coming. As a result of the back pain and the other problems she is unable to obtain or maintain any meaningful employment at this time.

Currently, after standing for 30 minutes the back pain gets worse and [she] has to sit for 15 minutes before she can sit again. She can sit for 30 minutes after which the back pain gets worse and [she] has to get up and move around for 15 minutes before she can sit again. She can walk for 15 minutes after which the back pain gets worse and [she] has to sit or lay [sic] down fo 15 minutes before she can walk again. She can lift up to 1 gallon; however, can not carry it for any distance. She can squat. She can drive or travel for 1 hour; after which the back pain gets worse and [she] has to [get] out of the vehicle and move around for 15 minutes before she can drive or travel again. She does complain of having poor grip with the left hand. However, she does not have any difficulty writing, typing, speaking, hearing, comprehending, or with fine manual activities.

Plaintiff was taking Toradol (non-steroidal anti-inflammatory), 50 mg as needed, and Ultram (a narcotic-like pain reliever), 50 mg, 1 to 2 at night. She was taking no other medications. Plaintiff was smoking a pack of cigarettes per day. She reported drinking alcohol occasionally. Plaintiff's physical examination was normal except she had tenderness in the area of T11-L2 and mild restriction of flexion, extension, and lateral flexion of the lumbar spine. "Otherwise all bones and joints of all four extremities revealed full range of motion." She had no weakness in any extremity. Gait was normal. "She had no difficulty dressing and undressing or getting on and off the examination table. She walked slowly without any assistive device."

Her memory was normal. Her mini mental status exam was normal (Tr. at 346).

Based on her physical examination today in an 8 hour day she can work full time in an employment not requiring heavy lifting, pushing, pulling. She has no restriction of

driving, traveling, typing, writing, speaking, comprehending, or with fine manual activities. She needs further evaluation and treatment for back pain. (Tr. at 337-340).

Dr. Hasan completed a range of motion values chart that same day showing that plaintiff's range of motion was entirely normal except flexion/extension (bending forward at the waist) was 70° while normal is 90°, and lateral flexion to the right and left (bending sideways at the waist) was 15° on each side while normal is 25°. Her grip strength was normal, muscle strength was normal (Tr. at 343-344).

On June 14, 2006, plaintiff had x-rays which showed fracture of the pedicle screws at T12 (Tr. 391-394, 571-574).

On July 3, 2006, plaintiff had a CT scan of her spine (Tr. at 569-570). The central canal was clear. The results of the CT scan were consistent with the June 14, 2006, x-rays.

On July 5, 2006, plaintiff had x-rays which showed fracture of the pedicle screws at T12 (Tr. at 385).

On July 6, 2006, plaintiff saw Dr. Chandra for a follow up (Tr. at 382, 575). He recommended she see a neurologist "and hopefully she will get set up for surgery."

On July 12, 2006, plaintiff saw John Gianino, M.D., a neurologist, after having been referred by Dr. Chandra (Tr. at 378-381, 417-418). Plaintiff reported that her pain is constant but has not worsened over time. It is located in her upper lumbar region with no radiation. Her pain is worse with activity but present when lying down or sitting. Plaintiff had no instability and her compression fracture had healed well. "Her only medication is Soma [muscle relaxer]. She is unemployed and on disability. She is divorced, with children. She smokes one pack of cigarettes per day and denies alcohol use." On exam, Dr. Gianino noted that plaintiff's back "has relatively good range of motion with mild pain." Straight leg raising was negative. She had no tenderness and normal strength.

13

She does have fracture of both the T12 pedicle screws; however, the instrumentation appears to be stable as well as the fusion. I think it is unlikely that removing the instrumentation would help the patient's pain. In addition, the portion of the screws that are embedded deep within the vertebral body would not be able to be removed without significant extensive bony removal which I do not think would be appropriate. In any case, since that I cannot completely rule out the possibility that there may be some improvement in her pain, I have suggested that I would be willing to proceed with removing at least the accessible portion of the instrumentation as long as the patient understands that the chances of helping her pain are small.

On August 21, 2006, plaintiff saw Dr. Chandra and reported that the specialist at Truman indicated that there was no reason to surgically remove the fractured pedicle screws, "that it may make it worse. She is just trying to deal with the pain." No physical exam was performed other than to check plaintiff's vital signs, heart and lungs. Dr. Chandra assessed chronic thoracic pain. He increased her Amitriptyline (antidepressant) and prescribed Skelaxin, a muscle relaxer (Tr. at 412, 566, 638).

On August 24, 2007, plaintiff saw Dr. Chandra for a follow up and medication refills (Tr. at 374, 412, 566, 638). The physical exam consisted of listening to her heart and lungs. He assessed chronic thoracic pain. He refilled her Amitriptyline at the same dose and prescribed Robaxin (muscle relaxer).

On December 21, 2007, plaintiff saw Dr. Chandra complaining of ear pain (Tr. at 411, 515, 565, 637). During this visit he refilled her Amitriptyline and Robaxin for back pain.

On March 25, 2008, plaintiff saw Dr. Chandra for a follow up on pain (Tr. at 411, 515, 565, 637). Dr. Chandra's physical exam consisted of checking plaintiff's heart and lungs. He assessed chronic thoracic pain and continued her on Amitriptyline. He switched her from Robaxin to Skelaxin, both muscle relaxers.

On September 15, 2008, plaintiff saw Dr. Chandra for a follow up (Tr. at 515, 565, 637). Her Amitriptyline and Skelaxin were refilled.

On April 10, 2009, plaintiff saw Dr. Chandra for a cough (Tr. at 514, 564, 636). She reported having quit smoking a week earlier. She was assessed with COPD exacerbation and given several prescriptions.

On April 27, 2009, plaintiff was seen at Lafayette Regional Medical Center where she was diagnosed with pneumonia (Tr. at 500-502, 526-528, 561-563, 599-613, 633-635). She reported having quit smoking three weeks earlier. Plaintiff also reported depression. "We will get her [to] resume her amitriptyline and we will offer some Ambien . . . at night as needed."

On May 7, 2009, plaintiff saw Dr. Chandra for a follow up on pneumonia (Tr. at 513, 560, 632). Her medications were continued and she was assessed with "pneumonia resolving."

On June 18, 2009, plaintiff saw Dr. Chandra for a follow up (Tr. at 513, 560). "Her biggest complaint is she has had a lot of weight gain and having some fatigue." She was assessed with weight gain/fatigue and chronic thoracic pain secondary to thoracic screw that is fractured. Dr. Chandra recommended blood work and he refilled her Amitriptyline.

On November 16, 2009, plaintiff saw Jackie Hamilton, a nurse practitioner, for treatment of a urinary tract infection (Tr. at 512, 554, 629).

On January 12, 2010, plaintiff saw Dr. Chandra for a follow up on pain management (Tr. at 511, 553, 625). His examination was limited to checking her vital signs, heart and lungs. He refilled plaintiff's Amitriptyline. "She has been stable on this medication for quite some time."

On February 16, 2010, plaintiff went to the emergency room complaining of a tooth ache (Tr. at 596-598). Plaintiff was given a prescription for antibiotics. The medical records indicate that plaintiff was the driver when she left the hospital (Tr. at 596).

On March 26, 2010, plaintiff saw Dr. Chandra for cough and congestion (Tr. at 510, 552, 624). She was diagnosed with bronchitis.

On May 2, 2010, plaintiff saw Jackie Hamilton, a nurse practitioner, for treatment for a urinary tract infection (Tr. at 509, 548, 623).

On June 4, 2010, plaintiff saw Jackie Hamilton, a nurse practitioner, about left elbow pain (Tr. at 508, 547, 619). Plaintiff was given a prescription for a steroid to reduce the inflammation.

On September 3, 2010, plaintiff saw Dr. Chandra complaining of low back pain (Tr. at 547, 619). He checked her heart and lungs and assessed low back pain. He refilled her Amitriptyline.

On November 5, 2010, plaintiff saw Dr. Chandra for a non-healing second degree burn without blistering on the back of her neck "from some type of hair dye" (Tr. at 546, 68).

On November 15, 2010, plaintiff saw Dr. Chandra for treatment for a urinary tract infection and for a burn on her neck from a curling iron (Tr. at 545, 617).

On January 5, 2011, plaintiff went to the emergency room complaining of a tooth ache (Tr. at 594-595). Plaintiff was smoking a pack of cigarettes per day. She was told to stop smoking and was given an antibiotic and a prescription for Vicodin, a narcotic pain medication.

On January 21, 2011, plaintiff underwent a consultative examination by John Keough, M.A., a licensed psychologist (Tr. at 529-531).

> When asked how she is disabled mentally, the claimant replied, "I am scared to death of trains, I have lived across the street from tracks for the past five years and it still gets to me whenever there is a particular sounding horn." Ms. Lee stated that she was involved in a train wreck on July 20, 1999. The claimant stated that her anxiety has subsided some since then and that the panic attacks rarely happen, unless she is sitting at a railroad crossing very long. . . . The claimant reports experiencing depression at a level of 5, on a scale of 1 to 10 and she said she feels bad when she's not working. Ms. Lee denied being suicidal. The claimant denied being depressed growing up. Ms. Lee

16

stated that the depression started at age 14, because she was pregnant and she lost the baby six months into the pregnancy. The claimant stated that she has had memory problems since the loss of her first child. Ms. Lee denied experiencing anger. The claimant stated that she has no trouble with understanding and following instructions, she said, "I'm pretty intelligent." . . . The claimant denied experiencing authority figure problems. Ms. Lee reports sleeping only two hours continuous and she said she is always tired. . . .

Ms. Lee's current psychiatric medication regimen, prescribed by Dr. Chandra, M.D., includes generic Elavil, 200 mg HS [at bedtime]. The claimant stated that she first received mental health treatment at age 14 or 15 and this was counseling and then medication started at age 24 or 25. Ms. Lee stated that her last counseling was in 2000. The claimant reported no history of inpatient care for psychiatric reasons.

* * * * *

Ms. Lee stated that she dropped out of school in the 10th grade, because she was pregnant and she said she has not gained a GED. The claimant denied any history of military service. Ms. Lee reports being first employed at age 19 and she said she last worked in 1996. The claimant described her employment history as being varied, with the longest time on any job being one week.

Ms. Lee reports being married, one time, beginning at age 18 and she said the marriage ended in divorce in 2003, with three children born, of whom she said she has custody. The claimant denied having any other children and she said she currently lives with her fiancé of eight years and her children.

Socially, the claimant stated that her friends come over. Ms. Lee denied having any hobbies. The claimant reports first using alcohol at age 14 and she said she had a problem with alcohol till age 25. Ms. Lee stated that she drank constantly and she said she continues to drink some now, on weekends. The claimant reports first using other street drugs at age 14, to include smoking marijuana for two years and she said she's tried acid once. Ms. Lee stated that she last used any street drug at age 16 and she denied any history of drug and alcohol treatment. The claimant reports first using tobacco products at age 10 and she said she currently smokes one package of cigarettes a day. Ms. Lee denied any history of legal problems. The claimant stated that she let her driver's license expire in 2009.

* * * * *

<u>Mental Status Examination</u>: Sarah Lee is a 33-year-old Caucasian female, whose self presentation was unremarkable. The claimant had multiple lip piercings and a piercing on her left eyebrow. Ms. Lee had no difficulty in understanding the framework of the interview and she was able to understand and follow instructions. The claimant stated that she is supposed to wear glasses. There were no indications of a hearing impairment. Ms. Lee appeared to be in some physical discomfort when she got up from the chair and was moving about. . . .

17

The claimant was clean in appearance, appropriately dressed and she exhibited adequate personal hygiene. Ms. Lee's facial expressions were unremarkable; eye contact was adequate. There were no unusual gestures or mannerisms. The claimant appeared to have no difficulty interacting with the consultant, although indications are that she was overemphasizing symptomology [sic]. Ms. Lee appeared to be in no acute emotional distress, as there was no significant evidence of depression or anxiety. The claimant's affective responses were inconsistent, with the manner in which she stated she felt, in that she did not present herself as a person experiencing a moderate level of depression ro anxiety. Ms. Lee's speech was clear, logical and coherent; there was no evidence of loose thought associations.

* * * * *

. . . [I]ndications are that intellectually she is functioning in the Low Average Range. . . . Ms. Lee's memory functioning appears to be adequate. . . .

Daily activities, reported by the claimant, includes [sic] rising by 6:30 AM on weekdays, getting her kids off to school, going back to bed because of her medications, watching TV, caring for the kids, sometimes napping and retiring by midnight. Ms. Lee reported no changes in interests or habits over the past year. When asked what restricts her most, the claimant replied, "My back. When asked what keeps her from working 40 hours a week for a year, the claimant replied, "My back." . . .

. . . Ms. Lee's ability to understand and remember instructions, on a sustained basis, necessary to make routine work-related decisions, without supervision, is somewhere between the simple to moderate level of complexity, as long as she is not using alcohol or other street drugs. The claimant's ability to sustain concentration, be persistent in tasks and maintain an adequate pace in productive activity necessary to be gainfully employed working 40 hours a week, in a mainstream work-related environment, for a duration of at least 12 months, with regard to psychological issues, would be adequate up to a complex or demanding setting. Ms. Lee's ability to adapt to the environment of others, respond appropriately to supervision in a work setting, adjust to changes in routine and interact socially in an appropriate manner, appears to be mildly impaired by anxiety, a mood disorder and a long history of substance abuse/dependence. . . .

<u>DIAGNOSTIC IMPRESSION</u>

Axis I:  Mood Disorder NOS
             Anxiety Disorder NOS
             Alcohol Abuse

Mr. Keough completed a Medical Source Statement (Mental) that same day (Tr. at 532-

535). He found that plaintiff's ability to understand, remember and carry out instructions is

not affected by her impairment. He found that she had mild restriction in her ability to

18

interact appropriately with the public, supervisors, and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting.

Plaintiff's weight was shown in her medical records as follows:

| | |
|---|---|
| 09/23/2004 | 144 pounds (Tr. at 325) |
| 10/25/2004 | 150 pounds (Tr. at 325) |
| 12/29/2004 | 156 pounds (Tr. at 325) |
| 02/01/2005 | 164 pounds (Tr. at 325) |
| 04/05/2005 | 166 pounds (Tr. at 325) |
| 12/06/2005 | 146 pounds (Tr. at 325) |
| 02/16/2006 | 160 pounds (Tr. at 325) |
| 03/16/2006 | 162 pounds (Tr. at 325) |
| 03/23/2006 | 162 pounds (Tr. at 325) |
| 06/13/2006 | 157 pounds (Tr. at 339) |
| 07/02/2006 | 156 pounds (Tr. at 410) |
| 07/06/2006 | 156 pounds (Tr. at 376) |
| 08/21/2006 | 150 pounds (Tr. at 376) |
| 08/21/2007 | 168.8 pounds (Tr. at 376, 410) |
| 12/21/2007 | 176.4 pounds (Tr. at 410) |
| 03/15/2008 | 179.8 pounds (Tr. at 410) |

C.      *SUMMARY OF TESTIMONY*

During the April 13, 2011, hearing, plaintiff testified; and Richard Sherman, a vocational expert, testified at the request of the ALJ.

1.    **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 33 years of age (Tr. at 33). She was 28 on her amended alleged onset date. Plaintiff has a 10th grade education (Tr. at 33). Plaintiff last worked in 1996 in a fast food restaurant (Tr. at 33). She left that job because she lost her babysitter (Tr. at 33). Plaintiff has three children who were 15, 12 and 10 at the time of the administrative hearing (Tr. at 33-34). Plaintiff lives with her fiancé and he takes care of her and her three children financially (Tr. at 34, 36). She lives in a house with stairs to get into the back door and stairs leading to the second floor (Tr. at 37-38).

Plaintiff is unable to work due to constant pain from her mid shoulder blade to her tail bone (Tr. at 34). She also has pain in her left collarbone and her left knee (Tr. at 35). She takes Amitriptyline and 600 mg of Ibuprofen for her pain (Tr. at 34). Plaintiff has trouble with her hands sometimes (Tr. at 35). They ache and she is unable to grasp small objects since her car accident in 1999 (Tr. at 36).

Plaintiff had surgery on her back in 1999 (Tr. at 36).

Plaintiff is 5'7" tall and weighs 195 pounds (Tr. at 34). In February 2006 (her amended alleged onset date) she weighed 150 pounds[6] (Tr. at 34-35).

Plaintiff has been treated for anxiety and depression but at the time of the hearing was taking no medication for those conditions (Tr. at 36). She stopped taking medication in 2000 or 2001 because she is unable to afford it, but her mental condition continues to be a problem (Tr. at 37).

Plaintiff spends most of her time lying on the couch (Tr. at 38). Lying down relieves her pain a little bit (Tr. at 38). During the past five years, plaintiff's fiancé and children have

_____

[6]Plaintiff actually weighed 160 in February 2006. Her most recent weight as reflected in the medical records was in March 2008 when she weighed 179.8 pounds.

done the cooking, cleaning, laundry, yard work and picking up around the house (Tr. at 38). Plaintiff has not driven in more than five years (Tr. at 39). She stopped driving because she could not take the pain (Tr. at 39). Plaintiff visits her family in Higginsville and Lexington (Tr. at 39). She does not attend her children's school activities because she is afraid of people (Tr. at 39). Her fiancé does the grocery shopping and runs the errands (Tr. at 39). In the past 30 days, though, she had been to a store twice (Tr. at 40). Plaintiff is unable to sit at a computer because her back and hands hurt too much (Tr. at 40). She is able to cut food, shower, and dress herself without difficulty (Tr. at 40).

## 2. Vocational expert testimony.

Vocational expert Richard Sherman testified at the request of the Administrative Law Judge. Plaintiff has no substantial gainful activity (Tr. at 41). She previously worked in fast food and as a cashier in a retail establishment but not at the substantial gainful activity level (Tr. at 41).

The first hypothetical involved a person who could lift, carry, push and pull 10 pounds except lifting from below waist level would be limited to less than 5 pounds; stand and walk for six hours per day and for 30 minutes at a time; sit for six hours per day and for 30 minutes at a time. The person could not climb ladders, ropes or scaffolds or crawl or work at unprotected heights. The person could occasionally perform all other postural activities; could have no interaction with the general public and only occasional interaction with coworkers (Tr. at 41-42). Such an individual would be able to work as a small parts assembler, DOT 706.684-022, light with a sit/stand option. There are 8,600 jobs in Missouri and 345,000 in the country (Tr. at 42). The person could also work as a photocopy machine operator, DOT 207.685-014, light with a sit/stand option. There are 1,900 in Missouri and 70,000 in the country (Tr. at 42). The person could work as an electronic sub-assembler, DOT 729.684-

21

054, light with a sit/stand option. There are 4,500 in Missouri and 90,000 in the country (Tr. at 42). All three of these jobs are SVP 2 (Tr. at 42).

The Dictionary of Occupational Titles does not describe whether a particular job has a sit/stand option (Tr. at 42). That portion of the expert's testimony is based on his training and experience (Tr. at 42-43). Apart from that difference, the expert's testimony is consistent with the Dictionary of Occupational Titles (Tr. at 42).

The second hypothetical involved a person who had to take unscheduled breaks beyond the normal mid-morning, lunch, and mid-afternoon breaks (Tr. at 43-44). Such a person could not work (Tr. at 44).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge George Bock entered his opinion on June 15, 2011 (Tr. at 10-23).

Step one. Plaintiff has no earnings at the substantial gainful activity level and has not worked since her amended alleged onset date (Tr. at 12-13).

Step two. Plaintiff has the following severe impairments: history of L1 compression fracture and T12-L2 pedicle screw fixation and fusion, obesity, post traumatic stress disorder, and anxiety also diagnosed as mood disorder (Tr. at 12-13). Plaintiff's history of left clavicle fracture and history of left knee problem are nonsevere (Tr. at 13). Plaintiff has had no treatment for these impairments (Tr. at 13). Plaintiff's alleged hand problem is not a medically determinable impairment (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13).

Step four. Plaintiff's subjective allegations are not credible (Tr. at 18). She has been absent from the workforce for most of her adult life for reasons unrelated to the allegedly disabling impairments (Tr. at 18). Plaintiff's statements about her symptoms and limitations

22

are greatly exaggerated (Tr. at 19). She testified to constant pain throughout her entire back, but described her pain to her doctor as a "dull ache" (Tr. at 19). Imaging studies show relatively minimal findings (Tr. at 19). Her doctor described her as "stable for quite some time" on conservative treatment consisting of non-narcotic medications (Tr. at 19). Her treating doctor described her back as having relatively good range of motion "with mild pain" (Tr. at 20). Plaintiff's doctors have not imposed any restrictions on her activities (Tr. at 21).

Plaintiff retains the residual functional capacity to perform light work except she must be able to change positions (i.e., have a sit/stand option) every 30 minutes; she cannot crawl, climb ladders, ropes or scaffolding, or work at unprotected heights; she can lift less than 5 pounds from below waist level; she should not be required to interact with the general public; and she should have only occasional interaction with coworkers (Tr. at 17). Plaintiff has no past relevant work (Tr. at 21).

Step five. Plaintiff is capable of performing jobs available in significant numbers such as small parts assembler, photocopy machine operator, and electronic subassembler (Tr. at 22). Therefore, plaintiff is not disabled (Tr. at 23).

## VI. *VOCATIONAL EXPERT TESTIMONY*

Plaintiff argues that the ALJ erred in relying on testimony of the vocational expert when that testimony conflicts with the Dictionary of Occupational Titles.

> The VE testified as to three "light" jobs available to Plaintiff. The weight lifting restriction of 10 pounds imposed by the ALJ, however, does not permit "light" work. 20 C.F.R. § 416.967(b) describes "light" work as requiring the ability to lift 20 pounds occasionally and 10 pounds frequently. "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." See also SSR 83-10.

Plaintiff's argument is without merit. The Dictionary of Occupational Titles defines light work as:

Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) **and/or a negligible amount of force constantly** (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. **Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.**

(emphasis added).

The vocational expert's testimony did not conflict with the Dictionary of Occupational Titles because the hypothetical question described the lifting requirements, and those lifting requirements are included in the strength requirement of light work. As shown by the definition of light work in the Dictionary of Occupational Titles, an ability to lift 20 pounds is not a requirement for every light job.

## VII.    *THIRD PARTY OBSERVATIONS*

Plaintiff argues that the ALJ erred in failing to mention the third-party statement of plaintiff's fiancé.

Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006), clarifies how SSA considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).

Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

24

1.   Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment.  Id.

2.   Only acceptable medical sources can provide medical opinions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.   Only acceptable medical sources can be considered treating sources.  20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists.  "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other care givers, siblings, other relatives, friends, neighbors, clergy, and employers.  20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).  "Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Id. quoting SSR 06-3p.

The courts have consistently criticized the Social Security Administration for failing to discuss third-party statements:

Where proof of a disability depends substantially upon subjective evidence, . . . a credibility determination is a critical factor in the Secretary's decision.  Thus, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  In this case, the administrative law judge was, of course, free to disbelieve the testimony of Basinger, his wife, and the affidavits of others.  This, however, the administrative law judge did not do.  Rather, the administrative law judge denied disability benefits based on the lack of objective medical evidence.  Basinger should not have his claim denied simply because he failed to see a physician near the time that his insured status expired.  The testimony indicated that Basinger had rarely sought medical attention throughout his lifetime.  Indeed, his

25

wife stated that she did not believe that Basinger had ever been to a doctor until 1968. She explained Basinger's failure to see a doctor. . . .

The error in this case was the failure of the administrative law judge to give adequate consideration to the objective testimony presented by the two physicians and the subjective testimony and affidavits of Basinger, his wife, and others.

We do not decide the question of whether this evidence was sufficient to prove that Basinger was disabled within the insured period. Before that determination is made, the administrative law judge must judge the credibility of the witnesses. If all of Basinger's evidence is to be given credence, we believe that Basinger has at least met his initial burden of showing that he could not return to his former employment. We reverse the decision of the district court and remand this case to the Secretary for further consideration of Basinger's claim. On remand, the administrative law judge should consider all of the relevant objective and subjective evidence presented by the claimant, and if any of the evidence is to be discredited, a specific finding to that effect should be made.

Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984) (citations omitted).

However, the fact that the courts have made this criticism on a regular basis does not mean that in every case the failure of an ALJ to analyze the credibility of third-party witnesses remand is automatic. For example, in Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000), the court held that the ALJ "implicitly" evaluated the testimony of the claimant and her witnesses by evaluating the inconsistencies between her statements and the medical evidence.

[B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible). Finally, we find that the ALJ did not discredit the statements of Young's friends merely on the grounds that they were not medical evidence; rather, the ALJ observed that the statements were devoid of specific information that could contradict the medical evidence regarding Young's capabilities during the relevant time period.

Id. at 1068-1069.

See also Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Bates v. Chater, 54 F.3d 529, 533 (8th Cir. 1995).

In this case, plaintiff's fiancé, Randy Merriman, Jr., completed a Function Report - Third Party (Tr. at 263-270). He reported that plaintiff cooks dinner while sitting in a chair. It takes her two hours to cook meals and she does this daily. Plaintiff is able to go out alone, she can drive but does so rarely due to pain -- "only drives if has no other choice". She shops in stores and on the computer. She shops once a week for about an hour. Plaintiff reads and watches television all the time but has to lie down while doing these things. People come to see plaintiff or she talks on the phone. She goes to the grocery store on a regular basis and does not need anyone to go with her. She has no problems getting along with family, friends, neighbors or others. Her condition does not affect her ability to understand, follow instructions, complete tasks, remember, concentrate, get along with others, or use her hands. She finishes what she starts, she can pay attention for "a while," she follows written and spoken instructions well, she gets along well with authority figures, she handles changes in routine "ok," she handles stress "fair." He concluded with the following:

> She has been unable to work since her injury and no one will hire her because of her injury an[d] feels like a burden because she can't provide for her children. She needs this to help care for her children, she doesn't get child support.

Mr. Merriman's statement is consistent with plaintiff's testimony and her own administrative documents. Therefore, because the same evidence also supports discounting the testimony of plaintiff's fiancé, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential. The ALJ found that plaintiff's statements about her symptoms and limitations were greatly exaggerated. He compared her description of constant pain to the relatively minimal findings on objective imaging studies, and he noted that plaintiff has been prescribed nothing more than an antidepressant and an occasional non-steroidal anti-inflammatory for pain. Physical therapy was recommended on one occasion. No narcotic medication has been prescribed for her back pain since shortly after her surgery in 1999. Her

27

medication dosages have remained steady for years.  Her treating doctor described her back pain as a dull ache and noted that she has been "stable for quite some time" on conservative treatment.  The ALJ pointed out the findings of examining doctors.  For example, Dr. Hasan found that plaintiff had only mild restriction of flexion, extension and lateral flexion of the lumbar spine and that she otherwise had full range of motion.  Plaintiff had no difficulty getting on or off the exam table or getting dressed and undressed.  She had no motor weakness and she had normal strength and gait.  With only a few restrictions, Dr. Hasan found that plaintiff could work a full-time job.  Dr. Gianino found no instability in plaintiff's spine.  She had good range of motion with only mild pain.  Her strength, reflexes and sensation were all normal.

> With regard to her testimony that she spends most of her time lying down, there has been no showing of medical necessity and the undersigned finds it amounts to a matter of choice.

(Tr. at 21).

Finally, the ALJ addressed plaintiff's motivation:

> [I]ncome queries reflect the claimant has a poor work record with no earnings at the SGA level.  In other words, she has been absent from the workforce for most of her adult life for reasons unrelated to the allegedly disabling impairments.  The fact that the claimant has never worked raises some questions as to whether her current unemployment is truly the result of medical problems.  An award of benefits would provide her with a consistent source of income at a level higher than she has earned in all her adult life.  Thus, her work record suggests she may not be motivated to work and may be exaggerating her symptoms to obtain benefits.

(Tr. at 18).

Because plaintiff is living off her fiancé's income, he has the same motivation as plaintiff to exaggerate her limitations in an effort to secure disability income.

Because the same evidence cited by the ALJ to discredit plaintiff's testimony also supports discounting the testimony of plaintiff's fiancé, the ALJ's failure to address his Function Report - Third Party is inconsequential.

28

## VIII. OBESITY

Plaintiff argues that the ALJ erred by failing to comply with SSR 02-1p by failing to address whether plaintiff's obesity meets or equals a listed impairment. This argument is without merit. First, I point out that the following occurred at the beginning of the administrative hearing:

ALJ: So you're not contending that she meets or medically equals a listing?

Plaintiff's Counsel: Correct.

(Tr. at 32).

SSR 02-1p states, in relevant part, as follows:

How Do We Evaluate Obesity at Step 3 of Sequential Evaluation, the Listings?

Obesity may be a factor in both "meets" and "equals" determinations.

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.

For example, when evaluating impairments under mental disorder listings 12.05C, 112.05D, or 112.05F, obesity that is "severe," as explained in question 6, satisfies the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function and in listings 112.05D and 112.05F for a physical impairment imposing an additional and significant limitation of function. We will find the requirements of listing 12.05 are met if an individual's impairment satisfies the diagnostic description in the introductory paragraph of listing 12.05 and any one of the four sets of criteria in the listing. . . .

We may also find that obesity, by itself, is medically equivalent to a listed impairment. . . . For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence.

29

We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

(footnote and references to child disability evaluations omitted).

In Heino v. Astrue, 578 F.3d 873, 881-882 (8th Cir. 2009), the Eighth Circuit held that the ALJ's reference to the claimant's obesity was sufficient to establish that obesity had been considered in assessing the claimant's residual functional capacity.

Heino also argues that the ALJ failed to consider her obesity in calculating her RFC. Upon review, we conclude that the ALJ sufficiently reviewed the record and that his decision referenced Heino's obesity. We have held that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal. Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004). In Brown, after his benefits were denied, the claimant argued on appeal that the ALJ failed to properly consider his obesity. Id. We affirmed the ALJ's denial of benefits because the "ALJ specifically referred to [the claimant's] obesity in evaluating his claim." Id.

Here, the ALJ made numerous references on the record to Heino's obesity. The ALJ stated that Heino was "5'1" tall and weighed 230 pounds at the time of the hearing." He also stated that "[a]t one time she had weighed as much as 325 pounds." In his hypothetical to the VE, the ALJ stated that Heino "has a history of obesity." The record indicates that the ALJ considered Heino's obesity when evaluating her claim. Because the ALJ specifically took Heino's obesity into account in his evaluation, we will not reverse that decision.

In this case the ALJ referenced plaintiff's obesity. He was not required to state specifically which functional restrictions were the result of plaintiff's obesity versus her other

30

impairments.  Plaintiff does not adequately distinguish Heino; and despite arguing that the ALJ committed reversible error by not further discussing obesity, plaintiff fails to suggest any further restrictions that should have been assessed as a result of her obesity.  Using SSR 02-1p for guidance, I note that there is no evidence that plaintiff suffered from any cardiovascular or respiratory impairments.  Her heart and lungs were consistently normal with the exception of a few occasions when she suffered from acute bronchitis (yet she continued to smoke against medical advice).  Her range of motion and strength were consistently normal in all extremities, her gait was normal, she had no abnormalities of any joint.  She complained of "some fatigue" on only one occasion during the 12 years covered by this medical record and that was while she was recovering from pneumonia.  She was never suspected of having sleep apnea.

Plaintiff cites only Dameron v. Astrue, 2009 WL 1912520 (W. D. Mo., July 1, 2009), an unpublished decision, in support of her argument that failure to discuss obesity further was an error.  In Dameron the ALJ's opinion was not included and therefore the court's finding that obesity needed to be further addressed is not particularly instructive.  Further, in that case the plaintiff was 5'1" tall and weighed 236 pounds, resulting in a body mass index of 44.6.  Plaintiff testified that she is 5'7" tall and weighed 195 pounds, resulting in a body mass index of 30.5.  A person is not generally considered obese until he as a body mass index of 30.0;[7] therefore, plaintiff is considered barely obese, based on her testimony that she weighed 195 pounds.  Further, I note that there technically is no medical support for the ALJ's finding that plaintiff is obese since the highest plaintiff's weight was ever recorded in her medical records was 179.8 pounds which would result in a body mass index of 28.2, below the level considered for obesity, and the ALJ found that plaintiff's testimony was not credible.

_____

[7]http://www.mayoclinic.org/diseases-conditions/obesity/basics/symptoms/con-20014834

31

In any event, I find that (1) the ALJ was not required to discuss how plaintiff's obesity affected each functional ability in her residual functional capacity, (2) plaintiff's counsel stated during the hearing that she did not meet or equal a listed impairment, and (3) plaintiff has failed to suggest how her residual functional capacity would have been assessed differently had the ALJ further discussed plaintiff's obesity at step three of the sequential analysis.

IX.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity because he failed to state specifically how plaintiff's impairments impacted her ability to interact with supervisors. This argument is without merit.

In a July 26, 2008, document, plaintiff was asked how her mental impairment affects her ability to work. She did not mention any difficulty with supervisors. On August 9, 2010, plaintiff completed a Function Report in which she reported that her condition does not affect her ability to get along with others and that she gets along with authority figures well. During an evaluation by Mr. Keough on January 21, 2011, plaintiff denied having any problems with authority figures.

Plaintiff's fiancé reported that plaintiff has no problems getting along with family, friends, neighbors or others; her condition does not affect her ability to get along with others; and she gets along well with authority figures.

Mr. Keough found that plaintiff's ability to deal with supervisors was mildly impaired due to anxiety disorder not otherwise specified as well as drug and alcohol abuse. However, the ALJ was not required to adopt every opinion of Mr. Keough. Additionally, the treatment records contain no complaints of anxiety, no observations of an anxious mood, and no treatment for anxiety; therefore, Mr. Keough's basis for a finding that plaintiff was mildly

32

restricted in her ability to interact with supervisors due to anxiety is not well supported (and again is based in part on plaintiff's past alcohol and drug abuse).

I have reviewed the ALJ's residual functional capacity assessment, the medical evidence, observations of others, and plaintiff's testimony. Contrary to plaintiff's complaints of constant, severe, disabling pain, the record shows that her treating doctor considered her stable on an anti-depressant. Her medication was rarely changed, her doses were rarely changed. Plaintiff was covered by Medicaid and did indeed seek fairly regular medical care; however, it was rarely for her allegedly disabling impairments. In 2008 she went to the doctor twice. In 2009 she went to the doctor five times -- once for a cough, twice for pneumonia, once for a urinary tract infection, and once for a follow up on her pain. In 2010 she went to the doctor eight times -- once for a toothache, twice for a urinary tract infection, once for a cough, once for a burn, once for elbow pain, and twice for a follow up on her back pain. In the past several years, plaintiff's treatment for her back pain has consisted entirely of getting refills on her medications. No doctor has ever recommended any restrictions other than shortly after plaintiff had back surgery. She is not being treated for any mental impairment. No medical professional has ever observed any mental symptoms, plaintiff has never been noted to have any difficulty interacting with people at doctors' offices, hospitals or emergency rooms.

I find that the ALJ's residual functional capacity assessment is supported by the credible evidence in the record.

## X.    CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 14, 2015